**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| THE IT GROUP, INC., et al., | ) | Case No. 02-10118(MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| THE SHAW GROUP, INC. and | ) | |
| SHAW ENVIRONMENTAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 04-57971 |
| | ) | |
| BECHTEL JACOBS COMPANY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**OPINION**[1]

Before the Court are cross-motions for summary judgment in the above-captioned adversary proceeding.  For the reasons set forth more fully below, the Court will grant the Plaintiffs' motion and deny the Defendant's motion.

I.   BACKGROUND

Plaintiff, Shaw Environmental, Inc., is a wholly owned subsidiary of Plaintiff, The Shaw Group, Inc. (collectively, "Shaw"), a Louisiana corporation that provides professional

_____

1  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Fed. R. Bankr. P. 7052.

engineering, construction, and consulting services.  The
Defendant, Bechtel Jacobs Company LLC ("Bechtel"), is the
environmental management contractor for the United States
Department of Energy's Oak Ridge Operations Office in Oak Ridge,
Tennessee.

Prior to the commencement of these jointly administered
bankruptcy cases, Bechtel, as general contractor, entered into
four subcontracts with The IT Group, Inc. (the "Debtor"): (i) for
the operation and maintenance of a Toxic Substance Control Act
incinerator for mixed hazardous wastes in Oak Ridge, Tennessee
(the "TSCA Contract"); (ii) for remediation work in an area
containing hazardous materials (the "Burial Ground Contract");
(iii) for remediation work in an area where a storage tank had
previously contained hazardous materials (the "Tank Contract");
and (iv) for remedial construction in Portsmouth, Ohio (the
"Portsmouth Contract").

On January 16, 2002, the Debtor and its affiliates
(collectively, the "Debtors") filed for relief under chapter 11
of the Bankruptcy Code.  Shortly thereafter, the Debtors and Shaw
entered into an Asset Purchase Agreement (the "APA"), whereby
Shaw agreed to purchase substantially all the Debtors' assets for
at least $262 million in cash, stock, and assumed liabilities.
The primary assets to be transferred were the Debtors' rights
under various project contracts, including three of the four

Bechtel subcontracts.[2]

The Court entered an Order on April 25, 2002 (the "Sale Order") approving the APA.  The parties consummated the sale on May 3, 2002 (the "Closing Date").  Pursuant to the APA, the Debtor assumed the TSCA, Tank, and Burial Ground Contracts (the "Assumed Contracts") and assigned them to Shaw.

On March 25, 2002, the Debtor filed a motion to reject the Portsmouth Contract.  On May 10, 2002, the Court granted the rejection motion, effective as of March 25, 2002.  Bechtel subsequently filed a proof of claim for rejection damages totaling $4,469,000.

Post-closing, the Debtors and Shaw agreed to memorialize the assignment of the TSCA, Tank, and Burial Ground Contracts by executing a Novation Agreement with Bechtel on May 3, 2002.  This Novation Agreement was incorporated into Subcontract Modifications executed by Shaw and Bechtel on April 30 and May 1, 2003.

Subsequent to the Closing on the APA, Shaw and Bechtel both performed under the Assumed Contracts.  Shaw submitted monthly invoices for its work, and Bechtel paid 90% of the invoiced amount, retaining 10% pursuant to the following clause in the subcontracts (the "Retention Provision"):

> Within 30 days after the receipt of a correct invoice, CONTRACTOR will pay SUBCONTRACTOR 90% of the approved

---

[2] Shaw determined not to take the Portsmouth Contract.

> invoice amount, retaining the balance ("Retention")
> pending Final Acceptance of the Work or as otherwise
> specified below.  Once the amount of Retention reaches
> $1,000,000, the CONTRACTOR will pay 100% of the
> approved invoice amount.

(TSCA Contract Ex. B, SC-13; Tank Contract Ex. B, SC-10.)[3]

As of the Closing Date, Bechtel held $659,521.70 of Retention under the TSCA Contract and $215,339.25 under the Tank Contract for work performed by the Debtor.  In the course of Shaw's performance after the Closing Date, the TSCA Retention grew to $1 million and the Tank Retention grew to $222,166.75.

On February 14, 2003, Shaw sent Bechtel an invoice for work done on the TSCA project, which it believed was due in full because it had reached the $1 million cap set forth in the Retention Provision.  In a letter dated June 23, 2003, Bechtel asserted a right of offset against the TSCA invoice for the Portsmouth Contract rejection damages and refused to pay the invoice.  Thereafter, Bechtel paid only 90% of the amount of Shaw's monthly invoices, apparently on the theory that the TSCA Retention was depleted by the offset and, therefore, had not reached the $1 million cap.

Shaw subsequently completed the Burial Ground Contract, and on January 14, 2004, Bechtel paid Shaw the entire Retention held by it thereunder ($674,294.64).

---

[3]  The Burial Ground Contract is not at issue in this dispute, but it apparently contained a similar provision.

The parties dispute whether Shaw subsequently completed the Tank Contract. They agree, however, that on June 4, 2004, Shaw submitted an invoice for payment of the Tank Retention. Bechtel responded to this invoice on July 28, 2004, by again asserting a right of offset for the Portsmouth Contract rejection damages.

Shaw commenced the instant adversary proceeding on December 17, 2004, seeking declaratory relief and damages for breach of contract and unjust enrichment. Both parties moved for summary judgment, and oral argument was held on November 16, 2005. At that time, the Court requested supplemental briefs, which have been filed. This matter is now ripe for decision.

II. JURISDICTION

The Court retained jurisdiction to "interpret, implement, and enforce the provisions of th[e] Sale Order." (Sale Order at ¶ 37.) This is a core proceeding over which the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (N) & (O).

III. DISCUSSION

A. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court

5

must review all of the evidence in the record and draw all
reasonable inferences in favor of the non-moving party.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986).

Cross-motions for summary judgment can be difficult to
resolve because "[i]nferences to which a party is entitled with
respect to the opponent's motion may not be granted with respect
to its own."  <u>Interbusiness Bank, N.A. v. First Nat'l Bank</u>, 318
F. Supp. 2d 230, 236 (M.D. Pa. 2004).  "Because the motions
essentially argue opposite sides of the same issues, however,
separate examination of each motion would only lead to confusion
and repetition.  Thus, the court will set out the contentions
made in each motion and the opposition thereto and will then
discuss the pertinent arguments."  <u>United States v. Hall</u>, 730 F.
Supp. 646, 648 (M.D. Pa. 1990).

The parties' summary judgment motions are premised on
different provisions of the Bankruptcy Code.  In its motion, Shaw
asserts that the Retentions were sold to it under section 363(f)
free and clear of any rights that Bechtel may have to them.  In
its motion, Bechtel asserts the contracts were assumed and
assigned <u>cum onere</u> pursuant to section 365 and that all terms of
the contracts must be enforced, including its right to set off
the Portsmouth rejection damages against the Retentions.

The Court concludes that under either section 363 or 365, Bechtel does not have the right to set off the Retentions from the Tank and TSCA Contracts assigned to Shaw against the rejection damages due by the Debtor under the Portsmouth Contract.  The Court will, consequently, grant Shaw's summary judgment motion and deny Bechtel's summary judgment motion.

B.   Section 363(f)

Bechtel contends that the TSCA and Tank Contracts were assumed and assigned under section 365, not sold under section 363, pursuant to the Sale Order.  Bechtel argues, therefore, that its right of setoff under those Contracts cannot be affected by section 363 and must be determined under section 365.

Contrary to Bechtel's assertions, executory contract rights are a form of "property" that is salable "free and clear" of interests under section 363(f).  In re Rickel Home Ctrs., Inc., 209 F.3d 291, 302 (3d Cir. 2000) (concluding that assignment of leases and executory contracts are subject to sale under section 363, and particularly section 363(m), because "[b]oth executory contracts and unexpired leases . . . are included in the definition of 'property of the estate' contained in section 541."); Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 498 (3d Cir. 1998) (holding that "section 363 governs the 'sales' of [executory] contracts here.  Section 365 provides some limitations and conditions to assignments; none of which

negates the applicability of section 363 to the sale, at auction, of [an executory contract].").

In addition to complying with section 363, however, sales of executory contracts and leases also have to comply with the protections afforded the contract party under section 365 of the Bankruptcy Code.  See, e.g., Cinicola v. Scharffenberger, 248 F.3d 110, 124 (3d Cir. 2001) (concluding that "the sale of an executory contract triggers the protections afforded sales of bankruptcy estate property but also requires satisfaction of the requirements for assuming and/or assigning the same executory contract."); In re Access Beyond Techs., Inc., 237 B.R. 32, 47 (Bankr. D. Del. 1999) (concluding that a "debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or executory contract, rather than assuming and assigning it.").

Shaw argues that Bechtel's purported offset rights were extinguished pursuant to section 363(f) of the Bankruptcy Code by paragraphs 7 and 11 of the Sale Order, which transferred the Debtors' "Assets" to Shaw "free and clear of all interests" and "Claims of any kind or nature whatsoever".  The APA defines "Assets" to include "all interests of [the Debtor] in the Assumed Contracts" and

> all accounts receivable . . . of whatever kind or
> nature, including all current and deferred rights to
> payment for projects completed or commenced or services
> rendered on or prior to the Closing Date, whether or
> not such services have been billed by [the Debtor] as
> of the Closing Date.

APA § 2.01(e) & (m).  Shaw contends that the Retentions are
similar to accounts receivable and further asserts that the sale
of them under section 363(f) eliminated Bechtel's right to set
off rejection damages due under the Portsmouth contract.  See,
e.g., Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV, 209 F.3d
252, 263 (3d Cir. 2000) (holding that sale of accounts receivable
under section 363 was not free and clear of defenses such as
recoupment but was free and clear of setoff rights, unless the
setoff was actually taken pre-petition); MBNA Am. Bank, N.A. v.
Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),
275 B.R. 712, 718 (Bankr. D. Del. 2002) (holding that sale under
section 363 eliminates unexercised setoff rights but not
recoupment defense).

     Bechtel argues that the Sale did not result in the sale of
the Retentions alone but in the sale of the entire TSCA and Tank
Contracts.  Bechtel asserts that the Contracts contained an
express condition precedent to return of the Retentions which was
that Bechtel be made whole in its other transactions with the
Debtor.  Bechtel argues that section 363 does not permit a sale
of the Contracts free and clear of this condition.  To hold
otherwise, Bechtel argues, would eviscerate section 365 by
allowing assignees to "purchase" the monetary benefits of an
executory contract free and clear of the corresponding burdens of
performance.

9

The Court agrees with Bechtel that the sale did not transfer the accounts receivable (i.e., the Retentions) without the underlying Contracts.  In this regard, it is distinguishable from Folger Adam in which only accounts receivable were sold while the underlying contracts were not assumed and assigned.  209 F.3d at 255.  Nonetheless, the Folger Adam case is instructive.  The Third Circuit in Folger Adam specifically held that the account debtor's defenses to payment based on alleged breaches of the underlying contract were not "interests" in the accounts receivable subject to elimination under section 363(f).  In support of that holding, the majority in Folger Adam noted that

> Bankruptcy law generally does not permit a debtor or an estate to assume the benefits of a contract and reject the unfavorable aspects of the same contract.  Yet, allowing the Debtors to recharacterize their contract rights as accounts receivable and sell them free and clear of the corresponding obligations yields that very result.

209 F.3d at 264 (internal citation omitted).

Bechtel argues that the Contracts assumed and assigned to Shaw contain a condition precedent to the payment of the Retentions.  To the extent that there is a condition precedent to Bechtel's obligation to pay the Retentions, the Court agrees that it would be a defense to a claim of breach of contract.  See, e.g., Strickland v. Lawrenceburg, 611 S.W.2d 832, 837 (Tenn. Ct. App. 1980) ("No liability under the contract attached . . . until such time as the condition precedent was fulfilled."); Mack v.

10

<u>Hugger Bros. Constr. Co.</u>, 10 Tenn. App. 402, 419 (Tenn. Ct. App. 1929) ("A condition precedent . . . <u>must</u> be fulfilled (by one party) before the duty (of the other party) to perform an existing contract arises." (emphasis added, quotations omitted)). The sale of the Contracts under section 363 could not eliminate that defense. <u>Folger Adam</u>, 209 F.3d at 264.

      1.   <u>Condition Precedent</u>

To determine whether the provision at issue is a condition precedent, however, the Court must examine the contract language, as well as Tennessee law.[4]  Bechtel alleges that the "condition precedent" is found in the following provision of the TSCA and Tank Contracts (the "Offset Provision"):

> Any <u>amounts otherwise payable under this Subcontract may be withheld</u>, in whole or in part, <u>if</u>:
> * * *
>     C.   SUBCONTRACTOR has not submitted:
>     (1)  Required Submittals (i.e., Schedule, Insurance Certificate, OSHA 200 logs, etc.)
>     (2)  Adjustments are due from previous overpayment or audit result; or
>     (3)  <u>Offsets in favor of CONTRACTOR in other transactions are asserted</u>.

(TSCA Contract Ex. B, SC-13 (emphasis added); <u>see</u> Tank Contract Ex. B, SC-10.[5])  Bechtel argues that, under the above provision,

---

    [4]  General Condition 4 of the TSCA and Tank Contracts provides that federal common law relating to government contracts and the laws of the state in which the work is primarily to be performed govern.  Both contracts were to be performed in Tennessee.

    [5]  The language of the Tank Contract differs in non-material respects.

11

it is not obligated to pay the Retentions because it asserted
offsets due under the Portsmouth Contract.

Shaw conceded in its opening briefs that the Offset
Provision states a condition precedent, but argues that the
Offset Provision was not enforceable because such a construction
of the clause would be unreasonable and would violate Tennessee
law, which requires mutuality.  See, e.g., Auton's Fine Jewelry &
Bridal Ctr., Inc. v. Beckner's, Inc., 707 S.W.2d 539, 540 (Tenn.
Ct. App. 1986) (holding that under Tennessee law, only demands
that are "mutual and subsisting between the same parties" may be
set off against one another).

The Court concludes that under Tennessee law, the provision
is not a condition precedent.  "[I]t is well-established that
condition precedents [sic] are not favored in contract law, and
will not be upheld unless there is clear language to support
them."  Koch v. Constr. Tech., Inc., 924 S.W.2d 68, 71 (Tenn.
1996).  Tennessee Courts define a "condition precedent" as "[a]n
event, not certain to occur, which must occur, unless its non-
occurrence is excused, before performance under a contract
becomes due."  Covington v. Robinson, 723 S.W.2d 643, 645 (Tenn.
Ct. App. 1986) (quoting Restatement (Second) of Contracts § 224).
"Whether a contractual provision is or is not a condition
precedent depends upon the parties' intention which should be
gathered from the language they employ and in light of all the

circumstances surrounding the contract's execution . . . ."
Harlan v. Hardaway, 796 S.W.2d 953, 957-58 (Tenn. Ct. App. 1990).

Bechtel's assertion that the Offset Provision creates a condition precedent is belied by the other terms of the Contracts.[6]  The clause immediately preceding the Offset Provision clearly states a condition precedent: "CONTRACTOR may, as a condition precedent to any payment, require SUBCONTRACTOR to submit . . . waivers and releases of all claims against CONTRACTOR . . . ."  (TSCA Contract Ex. B., SC-13; Tank Contract Ex. B., SC-10) (emphasis added).  The Offset Provision contains no such express language.

In a remarkably similar case, the Court in Koch concluded that a provision which did not use the term condition precedent was not one because another provision in the same contract did use the term.  "This sentence illustrates that the parties certainly knew how to create a condition precedent if they so desired.  That they did not use such unambiguous language in the first sentence prevents us from construing that sentence as a condition precedent to Koch's right to payment."  Koch, 924 S.W.2d at 73.

Similarly, the Offset Provision in this case does not contain any unambiguous language suggesting a condition

---

    [6] See Aetna Cas. & Sur. Co. v. Woods, 565 S.W.2d 861, 864 (Tenn. 1978) ("The whole contract must be considered in determining the meaning of any or all of its parts." (citation omitted)).

precedent, while the clause before it does.[7]  Consequently, the
Court cannot conclude that the Offset Provision is a condition
precedent.  A more natural reading of the Contracts is that the
Offset Provision is merely a right of setoff.

    2.   <u>Setoff</u>

Because the Offset Provision is a right of setoff, it
requires mutuality to be enforced.  <u>Auton's</u>, 707 S.W.2d at 540.
In <u>Auton's</u>, a party bought an account receivable at a foreclosure
sale, which under Tennessee law was free and clear of interests
similar to a sale under section 363.  <u>Id.</u> at 540, <u>citing</u> Tenn.
Code Ann. § 47-9-504(4).  The account debtor sought to defend
against a collection action by the purchaser by asserting the
right to set off a debt owed it by the original owner of the
account receivable.  The Court noted that "[e]ssential to
establishing a right of setoff, are the requirements that the
demand be mutual and subsisting between the same parties . . . ."
<u>Id.</u>  The sale to a third party eliminated that mutuality and,

---

    [7]   The same concepts used in contract interpretation apply
to statutory construction.  <u>Cf.</u> <u>Duncan v. Walker</u>, 533 U.S. 167,
173 (2001) (noting that "where Congress includes particular
language in one section of a statute but omits it in another
section of the same Act, it is generally presumed that Congress
acted intentionally and purposely in the disparate inclusion or
exclusion"); <u>In re Donald</u>, 343 B.R. 524, 537 (Bankr. E.D.N.C.
2006) (stating that "the use of a particular phrase in one
statute but not in another 'merely highlights the fact that
Congress knew how to include such a limitation when it wanted
to'." (<u>quoting</u> <u>In re Coleman</u>, 426 F.3d 719, 725 (4th Cir.
2005))).

therefore, the Court concluded that the purchaser could collect the account receivable without any setoff against it by the account debtor.  Id.  See also Citizens Bank v. Strumpf, 516 U.S. 16, 18 (1995) (noting the right of setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A'." (quoting Studley v. Boylston Nat'l Bank, 229 U.S. 523, 528 (1913) (emphasis added)).  In this case, allowing Bechtel to set off its obligation to Shaw against Bechtel's claim against the Debtor would result in a different absurdity - essentially, A (Bechtel) would not have to pay B (Shaw) because C (Debtor) owes A.

Shaw argues that the phrase "other transactions" in the Offset Provision means other transactions with "SUBCONTRACTOR," which is now Shaw.  Shaw concedes that to the extent there are any sums due by it to Bechtel under any of the Contracts assigned by the Debtor to it, Bechtel may offset those sums against the Retentions.  Shaw argues, however, that Bechtel may not offset sums due by the Debtor because there is no mutuality between the Debtor and Shaw.

Bechtel argues, however, that "SUBCONTRACTOR" under the Contracts is the Debtor, because that is who it was at the time the TSCA and Tank Contracts were executed.  Bechtel contends that Shaw stands in the shoes of the Debtor with respect to the TSCA

15

and Tank Contracts, and, therefore, any rights assertable by Bechtel against the Debtor are still assertable against Shaw under the Contracts assigned to it.[8]  Bechtel argues that any other interpretation would impermissibly modify the terms of the TSCA and Tank Contracts that were assigned to Shaw.  See, e.g., Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001) (holding that an assignment does not modify the terms of the underlying contract); Piedmont Print Works, Inc. v. Receivers of People's State Bank, 68 F.2d 110, 111 (4th Cir. 1934) (holding that contract party could still offset funds placed on deposit by assignor to secure payment of assigned note).  Therefore, Bechtel asserts that the parties can agree to a right of setoff even if no mutuality exists.  It asserts that the Contracts did just that.

The Court disagrees with Bechtel's conclusion.  Bechtel's argument that SUBCONTRACTOR still means the Debtor for purposes

---

[8]  Both Shaw and Bechtel assume (without analysis) that Bechtel's setoff rights would have been enforceable against the Debtor absent a sale of the TSCA and Tank Contracts.  This is not the case. "[P]re-petition claims against the debtor cannot be setoff against post-petition debts to the debtor."  Lee v. Schweiker, 739 F.2d 870, 875 (3d Cir. 1984).  11 U.S.C. § 553(a). Although the Portsmouth Contract was rejected post-petition, Bechtel's claim for rejection damages is treated as a pre-petition claim.  11 U.S.C. §§ 365(g)(1).  Bechtel's obligation to return the TSCA and Tank Retentions, however, arose post-petition, as did its obligation to pay 100% of the amount of the TSCA Contract invoices once the TSCA Retention reached $1 million.  Therefore, even if the Contracts were still with the Debtor, Bechtel would  not be able to offset the rejection damages claim under the Portsmouth Contract against the post-petition amounts due under the TSCA and Tank Contracts.

of allowing an offset is inconsistent with its assertion that SUBCONTRACTOR means Shaw for purposes of performance under the assigned Contracts.  Bechtel cannot have it both ways.  The term SUBCONTRACTOR cannot mean both Shaw and the Debtor at the same time.  Rather, at the time of the assignment of the TSCA and Tank Contracts, Shaw became the SUBCONTRACTOR and all obligations and benefits flowing from that position became Shaw's.

Furthermore, the cases cited by Bechtel in support of this position are factually distinguishable from this case.  In fact, <u>Medtronics</u> supports the opposite conclusion.  In that case, the Defendant sought to enforce an arbitration clause and release in a contract assigned to the Plaintiff to claims between the parties unrelated to the assigned contract.  247 F.3d at 48.  The Third Circuit rejected that argument concluding that:

> When [Plaintiff] stepped into [assignor's] shoes, it had to adhere to the covenant not to sue on [assigned] claims.  But absent a provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held and <u>not in an expansion of those rights to include those held by the assignee</u>.

<u>Id.</u> at 60 (emphasis added).  Similarly, in this case, the assignment to Shaw did not expand Bechtel's rights to include the right to set off obligations owed it by the Debtor against obligations it owed to Shaw.

<u>Piedmont</u> is also easily distinguished because in that case the Court found that the assignor had agreed to leave funds on

17

deposit with the bank to secure repayment of the assigned obligation.  68 F.2d at 111.  Further, the Piedmont case involved a parent/subsidiary as the assignee/assignor and the Court relied heavily on the "identity of interest between the holding company and its subsidiary" in concluding that the subsidiary's deposit could be setoff against the debt assumed by the parent.  Id.  In this case there is no such express agreement by Shaw.  Shaw agreed to be bound by the Contracts and to allow the Retentions to be applied against amounts it owed; there is no evidence Shaw agreed to allow the Retentions to be applied against obligations owed by the Debtor.

Consequently, the Court concludes that there is no mutuality between the rejection damages under the Portsmouth Contract, which are due only by the Debtor because it was not assigned to Shaw, and the sums due to Shaw by Bechtel under the TSCA and Tank Contracts.  There being no mutuality, the Offset Provision does not apply to those sums, and the payment of the Portsmouth Contract rejection damages cannot be offset against, or preclude, the payment of the Retentions.[9]

---

[9]  Bechtel argues that Shaw is estopped from challenging Bechtel's interpretation of the Offset Provision because General Condition 25 of the TSCA and Tank Contracts provides that, with respect to "questions concerning interpretation and clarification of [the] Subcontract[s]," Bechtel's "determinations, instructions, and clarifications . . . shall be final and conclusive unless determined to have been fraudulent or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence." Because the Court concludes that Bechtel's interpretation is

C.    Section 365

Whether the Offset Provision is characterized as a condition precedent or setoff right under the assumed contracts is not really relevant, however, to the consideration of it under section 365.

Shaw asserts that the TSCA and Tank Contracts were assumed and assigned to it free of any obligations under the Portsmouth Contract which was not assigned to it. It further asserts that its entitlement to the Retentions was free and clear of any offset rights that Bechtel may have.

According to Bechtel, it is not seeking to recover the rejection damages or otherwise enforce any obligations under the Portsmouth Contract. It is only seeking to enforce its rights under the TSCA and Tank Contracts, which were assumed and assigned to Shaw. Specifically, Bechtel argues that the Debtor's (and, therefore, Shaw's) right to return of the Retentions was a contingent, unmatured right under the TSCA and Tank Contracts that were assumed and assigned cum onere pursuant to section 365. See 11 U.S.C. § 365(f)(2)(A); In re Italian Cook Oil Corp., 190 F.2d 994, 997 (3d Cir. 1951) ("The trustee . . . may not blow hot and cold. If he accepts the contract he accepts it cum onere. If he receives the benefits he must adopt the burdens. He cannot

_____

inconsistent with the law, it a fortiori must be "capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence."

accept one and reject the other."). As the Debtor's assignee, Bechtel argues, Shaw stands in the Debtor's shoes and is bound by the terms of the contracts to the same extent the Debtor would be. Medtronic AVE, 247 F.3d at 60 ("An assignment is intended to change only who performs an obligation, not the obligation to be performed." (quoting Capitan Enters., Inc. v. Jackson, 903 S.W.2d 772, 776 (Tex. Ct. App. 1994))).

  1. Cross-Default Rule

  At the conclusion of oral argument, the Court asked the parties to brief whether the Offset Provision, as construed by Bechtel, would constitute an unenforceable restriction on the assumption and assignment of the TSCA and Tank Contracts. This inquiry was occasioned by the following passage in Bechtel's Reply Brief in support of its motion for summary judgment:

> The cross-offset provisions of the contracts with the Debtor were specifically sought as additional credit protection for [Bechtel] and to ensure that the Debtor would fulfill its obligations under all of its contracts with [Bechtel], not merely its obligations under those contracts that the Debtor found advantageous. Shaw's argument would permit a debtor to avoid cross-offset, cross-default and cross-payment contractual obligations by assigning advantageous contracts to third parties then rejecting the disadvantageous contracts. Extinguishing such contractual rights would violate good public policy and enhance the value of the Debtors' assets at the expense of innocent creditors.

  Bechtel's argument evinces a fundamental misunderstanding of bankruptcy law and policy. Section 365 expressly authorizes "the [debtor] to maximize the value of the debtor's estate by assuming

20

executory contracts and unexpired leases that benefit the estate
and rejecting those that do not." Rickel Home Ctrs., 209 F.3d at
298.  "Having assumed an executory contract or unexpired lease,
the [debtor] may elect to assign it.  The Code generally favors
free assignability as a means to maximize the value of the
debtor's estate and, to that end, allows the [debtor] to assign
notwithstanding a provision in the contract or lease, or
applicable law, prohibiting, restricting, or conditioning
assignment."  Id. at 299.  Courts have uniformly held that

> in order to assume a particular executory contract or
> unexpired lease, the [debtor] is only required to
> perform under that discrete contract or lease, not
> under other, substantially unrelated agreements.  This
> principle applies where distinct agreements are set out
> in the same document.  And, of particular relevance
> here, it applies where distinct agreements are linked
> by a cross-default clause, providing for a loss of
> rights under one agreement if another agreement is
> breached.
>     Thus, as noted in In re Convenience USA, Inc., No.
> 01-81478, 2002 WL 230772, at *2 (Bankr. M.D.N.C. Feb.
> 12, 2002), assumption under § 365 is subject to a
> "well-established" cross-default rule: "[C]ross-default
> provisions do not integrate executory contracts or
> unexpired leases that otherwise are separate or
> severable."

United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL
Corp.), 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006) (emphasis in
original, citations omitted) (denying enforcement of cross-
default provision in lease of airport terminal space and separate
agreement to make payments on certain bonds).

Just as the cum onere rule prevents the estate from
avoiding obligations that are an integral part of an

> assumed agreement, so the cross-default rule prevents
> the nondebtor party from imposing on the estate the
> costs of substantially unrelated agreements.

Id. at 468 n.11.

Shaw argues that the Offset Provision is virtually indistinguishable from cross-default clauses which have been held unenforceable in other contexts.  See, e.g., EBG Midtown S. Corp. v. McLaren/Hart Envt'l Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 597 (S.D.N.Y. 1992) (holding that cross-default provision of two leases of separate floors was not enforceable and rejection of one lease did not prohibit assignment of the other), aff'd, 993 F.2d 300 (2d Cir. 1993); In re Wheeling-Pittsburgh Steel Corp., 54 B.R. 772, 779 (Bankr. W.D. Pa. 1985) (holding that cross-default provisions in insurance policies were unenforceable because they "would impermissibly restrict the Debtor's ability to assume some of the policies and reject others"), aff'd 67 B.R. 620 (W.D. Pa. 1986); In re Sambo's Rests., Inc., 24 B.R. 755, 757 (Bankr. C.D. Cal. 1982) (concluding that cross-default provisions in leases were unenforceable because "[a]ny contractual restriction on assignment other than those specified in § 365(c) is proscribed by § 365(f).").  Allowing Bechtel to enforce the Offset Provision, Shaw argues, would offend bankruptcy policy by transforming Bechtel's general unsecured claim for Portsmouth Contract rejection damages into a de facto priority claim.  See

22

Kopel v. Campanile (In re Kopel), 232 B.R. 57, 65-66 (Bankr.
E.D.N.Y. 1999).  See also Sambo's Rests., 24 B.R. at 758
(declining to enforce cross-default clause in real property lease
because it would permit lessor to recover full lease rejection
damages notwithstanding cap under section 502(b)(6)).

Bechtel argues that the Offset Provision is not an express
prohibition on assignment of any of the other Contracts and
contends it is readily distinguishable from a cross-default
clause.  It argues that the cross-default rule is premised on
section 365(f)(3) which provides that any provision in an
executory contract that "terminates or modifies" the contract if
it is assigned is not enforceable.  Bechtel argues that the
problem with a cross-default clause is that it essentially
prohibits the rejection of one contract and the assignment of
another by requiring a cure[10] of the rejected contract as a
prerequisite to assumption of the other.  EBG Midtown, 139 B.R.
at 596.  In contrast, Bechtel argues that the Offset Provision in
this case did not preclude separate assumption and assignment of
the various Bechtel subcontracts and did not require the cure of
the Portsmouth Contract.  Indeed, the TSCA and Tank Contracts
were assumed, while the Portsmouth Contract was rejected.
Because the Offset Provision did not prohibit any assignment,

---

[10]  Section 365(b)(1)(A) provides that an executory contract
cannot be assumed or assigned unless all defaults under the
contract are cured.

Bechtel argues, it does not offend the policy behind the cross-default rule and remains enforceable.  Bechtel argues further that enforcement of the Offset Provision in this case would not "extract priority payments" from the Debtor.  Kopel, 232 B.R. at 65-66.  Rather, such payments would come from Shaw, the Debtor's assignee.

The Court rejects Bechtel's arguments.  The fact that the Offset Provision did not expressly "prohibit" separate assumption and rejection of the Bechtel subcontracts is irrelevant.  The Third Circuit has noted that section 365(f) was "designed to prevent anti-alienation or other clauses in leases and executory contracts assumed by the [debtor] from defeating his or her ability to realize the full value of the debtor's assets in a bankruptcy case."  In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1993).  Therefore, the offending provision may not necessarily be one that directly prohibits assignment of a contract, but may be one that indirectly interferes with a debtor's ability to realize the value of its assets.  "De facto anti-assignment provisions may be found in a variety of forms including lease provisions that limit the permitted use of the leased premises, lease provisions that require payment of some portion of the proceeds or profit realized upon assignment, and cross-default provisions."  In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 50 (Bankr. M.D.N.C. 2003) (citations omitted).

24

Cross-default provisions are "inherently suspect" because they interfere with the debtor's rejection power by saddling the estate (albeit indirectly) with the burdens of unwanted executory contracts. Kopel, 232 B.R. at 64. Under Bechtel's own interpretation of the Offset Provision, the Debtor's default (i.e., rejection) of the Portsmouth Contract triggered the loss of substantial rights under the TSCA and Tank Contracts (i.e., return of the Retentions and full payment of invoices). As a result, the Court concludes that the Offset Provision is a classic cross-default clause which is not enforceable under section 365(f)(3). See United Air Lines, 346 B.R. at 470.

Whether the estate shoulders these burdens as a cure cost prior to assumption of desirable contracts or, as in this case, by periodic "offsets" over the life of the contracts post-assumption, bankruptcy policy is equally offended. The rejection power is frustrated and one creditor, based on the happenstance of having multiple, cross-defaulted contracts with the Debtor, receives a dollar-for-dollar distribution on its rejection damages claim from assets that would otherwise be available to the estate for the benefit of all creditors.

The possibility that the Debtor's assignee may shoulder this burden in a given case is a distinction without difference. A rational assignee with knowledge of the cross-defaulted liabilities would simply reduce its purchase price accordingly,

25

thereby diminishing the value realized by the estate from the sale of the remaining contracts.

Bechtel argues nonetheless that "the modification of a contracting party's rights is not to be taken lightly" and "a bankruptcy court in authorizing assumptions and assignment . . . must be sensitive to the rights of the non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full benefit of his or her bargain."  In re Joshua Slocum, Ltd., 922 F.2d 1081, 1091 (3d Cir. 1990).  See also Kopel, 232 B.R. at 66 (noting that "enforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain.").  Bechtel submitted the affidavit of its Procurement Manager, Robert E. Lynch, to establish that striking the Offset Provision from the TSCA and Tank Contracts would thwart Bechtel's bargain.  Lynch stated that (1) the Offset Provision is "standard language included in all [Bechtel] contracts with its subcontractors" and (2) Bechtel "will not enter a sub-contract that does not include" the Offset Provision.

Shaw notes that nowhere does Lynch state that the cross-default of Portsmouth Contract obligations was a "bargained for element" of the TSCA and Tank Contracts.  See Joshua Slocum, 922 F.2d at 1091.  In fact, Lynch's testimony that the clause is standard in all Bechtel's contracts compels the opposite conclusion.  Therefore, Shaw argues, modifying the Offset

Provision in the TSCA and Tank Contracts is entirely proper.

The Court agrees with Shaw.  The "critical feature" of decisions which do not invalidate cross-default provisions is "that the agreements linked by a cross-default clause were <u>economically interdependent</u>: the consideration for one agreement supported the other."  <u>United Air Lines</u>, 346 B.R. at 470 (emphasis added), <u>citing</u> <u>Lifemark Hosps., Inc. v. Liljeberg Enters. (In re Liljeberg Enters.)</u>, 304 F.3d 410, 445 (5th Cir. 2002) (upholding cross-default provision in one agreement where non-enforcement "would collapse the [other] agreement" and "thwart [non-debtor party's] bargain in agreeing to enter into the [other] agreement"); <u>Kopel</u>, 232 B.R. at 67 (enforcing cross-default clause in lease and collateral note where they were "contemporaneously executed as necessary elements of the same transaction, such that there would have been no transaction without each of the other agreements").

> In contrast to [<u>Lifemark Hospitals</u>] and <u>Kopel</u>, courts have repeatedly refused to enforce cross-default clauses that attempt to link parallel contracts with unrelated consideration.  <u>In re Adelphia Business Solutions, Inc.</u>, 322 B.R. 51, 62-63 (Bankr. S.D.N.Y. 2005) (separate leases for different space in the same building); [<u>EBG Midtown</u>, 139 B.R. at 596] (same);  <u>In re Plitt Amusement Co. of Wash., Inc.</u>, 233 B.R. 837, 847 (Bankr. C.D. Cal. 1999) (leases for motion picture theaters in different communities); [<u>Sambo's Rests.</u>, 24 B.R. at 757] (separate leases for restaurants); [<u>Wheeling-Pittsburgh</u>, 54 B.R. at 78-81] (separate insurance policies).  In these cases, the courts found that allowing the debtors to assume individual contracts - notwithstanding cross-default provisions linking them to others that could be rejected - would

    not frustrate the economic interests underlying the
    contracts.

United Air Lines, 346 B.R. at 469-70.  See also In re Wolflin

Oil, L.L.C., 318 B.R. 392, 399 (Bankr. N.D. Tex. 2004) (denying

enforcement of cross-default provision in six separate automotive

service center leases).

    Nothing in the Lynch Affidavit suggests that the operation

and maintenance of a hazardous waste incinerator and remediation

of a hazardous waste storage tank site in Tennessee (i.e., the

consideration for the TSCA and Tank Contracts, respectively) are

"economically interdependent" with remedial construction work in

Ohio (i.e., the consideration for the Portsmouth Contract).

Accordingly, Bechtel has failed to establish that the TSCA, Tank,

and Portsmouth Contracts were so intertwined that striking the

Offset Provision would thwart its bargain.  Cf. Wolflin, 318 B.R.

at 399 (finding non-debtor lessor's "self-serving testimony that

he would not have entered into the leases with the Debtor without

the cross-default provisions . . . unconvinc[ing]" and

insufficient to "overrid[e] the policy of the Code of allowing

debtors to selectively assume or reject . . . divisible

agreements.").

    Bechtel suggests that it was not afforded notice and an

opportunity to be heard regarding the modification of its

contract rights.  The Court disagrees.  Several parties objected

to the proposed sale of executory contracts to Shaw on the

grounds that ostensibly "separate agreement[s] . . . constituted a single transaction that required assuming or rejecting" <u>in toto</u>.  (<u>See</u> Sale Order at ¶ 2(c) (preserving such objections for subsequent adjudication).)  Bechtel did not object on that basis.

Nor did Bechtel object to language in the proposed Sale Order: (1) providing that assignment of the Assumed Contracts to Shaw "shall not subject Shaw to any liability . . . with respect to the operation of the Debtors' businesses prior to the Closing Date" (<u>id.</u> at ¶ Q); (2) excluding the Portsmouth Contract from the "Assumed Contracts" to be sold to Bechtel (<u>id.</u> at ¶ 12); (3) providing that "Shaw shall not in any way be responsible for obligations under . . . Excluded Contracts" (<u>id.</u> at ¶ 19); (4) enjoining "each holder of an Excluded Liability . . . from commencing, continuing, or otherwise pursuing any remedy, claim, or cause of action against Shaw" under any circumstances (<u>id.</u> at ¶ 35.); and (5) retaining jurisdiction to "protect Shaw against . . . any of the Excluded Liabilities" (<u>id.</u> at ¶ 37.).  Any one of these provisions was sufficient to put Bechtel on notice that its cross-offset rights, at least as Bechtel understood them, would be modified as a result of the assumption and assignment of the TSCA and Tank Contracts to Shaw.  If Bechtel had a colorable objection to such modification, Bechtel should have raised that objection at the Sale Hearing.

In light of the foregoing, the Court concludes that, even if Bechtel's cross-offset rights were not limited by sections 553(a) and 363(f) of the Bankruptcy Code, they were unenforceable as restrictions on assumption and assignment under section 365.

D.   <u>Novation of the TSCA and Tank Contracts</u>

Bechtel argues that the novation of the TSCA and Tank Contracts resurrected the Offset Provision and rendered it fully enforceable against Shaw notwithstanding the Sale Order. Paragraph (b)(4) of the Novation Agreement provides:

> [Shaw] agrees to be bound by and to perform each subcontract in accordance with the conditions contained in the subcontracts.  [Shaw] also assumes all obligations and liabilities of, and all claims against, the [Debtor] under the subcontracts as if [Shaw] were the original party to the subcontracts.  The [Debtor] is relieved of liability for all claims in connection with performance of the contracts, before or after May 3, 2002, in accordance with the terms of the Sale Order.

Paragraph (b)(9) provides further that the TSCA and Tank Contracts "shall remain in full force and effect, except as modified by this Agreement."

The Court finds this argument unpersuasive.  The TSCA and Tank Contracts were novated by the Sale Order even without the subsequent Novation Agreement.  <u>In re Anchor Resolution Corp.</u>, 197 F.3d 76, 80 (3d Cir. 1999) (holding that assumption and assignment pursuant to section 365 effects "a novation by operation of law whether or not the obligee consents").  As discussed above, the Sale Order nullified the Offset Provision to

the extent it cross-defaulted the TSCA and Tank Contracts with the Portsmouth Contract.

Shaw argues further that, even if the Novation Agreement created new liability for the Debtor's breach of the Portsmouth Contract, it would fail for lack of consideration. "The modification of an existing agreement which imposes new obligations on one of the parties is unenforceable for lack of consideration unless it also imposes a new obligation on the other party." Dunlop Tire & Rubber Corp. v. Serv. Merch. Co., 667 S.W.2d 754, 759 (Tenn. Ct. App. 1983).

The only consideration provided by Bechtel for the Novation Agreement was its promise (1) to recognize Shaw as the counter-party to the TSCA and Tank Contracts and (2) to waive any claims and rights against the Debtor in connection with the TSCA and Tank Contracts. (Novation Agreement at ¶¶ (b)(2) & (4).) The Sale Order, however, already required this of Bechtel. Thus, Bechtel's promise was not sufficient consideration to support Shaw's alleged agreement to become fully bound by the Offset Provision. Hanks v. Barron, 95 Tenn. 275, 279 (1895) ("The performance of an existing legal obligation, without more, by one person, affords no consideration, in law, for an original undertaking by another person."). Thus, the Court concludes that the Novation did not create any additional rights in favor of Bechtel, and even if it did, it fails for lack of consideration.

31

IV.    <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the summary judgment motion filed by Shaw and deny the summary judgment motion filed by Bechtel.  The Court finds that the Sale Order issued under sections 363 and 365 of the Bankruptcy Code precludes Bechtel from offsetting any rejection damages arising under the Portsmouth Contract against amounts that are otherwise due and owing to Shaw under the TSCA and Tank Contracts. Accordingly, Bechtel's failure to pay 100% of Shaw's invoices after the TSCA Retention reached $1 million constituted a breach of the TSCA Contract.

Dated: September 21, 2006          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge